RENDERED:  DECEMBER 18, 2025
TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0497-DG

JEREL COLEMON, AS
ADMINISTRATOR AND PERSONAL
REPRESENTATIVE OF THE ESTATE
OF WILLIAM VIRGIL

APPELLANT

V.

ON REVIEW FROM COURT OF APPEALS
NO. 2022-CA-0415
CAMPBELL CIRCUIT COURT NO. 20-CI-00489

WESTPORT INSURANCE COMPANY,
AS SUCCESSOR TO COREGIS
INSURANCE COMPANY

APPELLEE

**OPINION OF THE COURT BY JUSTICE GOODWINE**

**<u>AFFIRMING</u>**

William Virgil was incarcerated for twenty-eight years for a murder to which DNA evidence proved he had no connection. After his release, Virgil filed a lawsuit in federal court under 42 U.S.C.[1] § 1983 against the City of Newport and past and present employees of the Newport Police Department (collectively, "Newport").[2] Virgil alleged personal injuries resulting from his wrongful prosecution. Westport Insurance Company, as successor to Coregis Insurance

---

[1] United States Code.

[2] *Virgil v. City of Newport*, No. 16-cv-224-DLB-EBA.

Company ("Westport"), insured Newport from July 1, 1998, until July 1, 2000. Westport then sought a judicial determination of its coverage obligations in the Campbell Circuit Court. The circuit court granted summary judgment in favor of Westport, finding coverage was not triggered under its policies. The Court of Appeals affirmed. Jerel Colemon, as administrator and personal representative of the Estate of William Virgil ("Colemon"), sought discretionary review, which we granted. After review of the record, applicable law, and the arguments of the parties, we affirm the decision of the Court of Appeals.

## BACKGROUND

In 1987, Retha Welch was murdered. Virgil was charged with and convicted of the murder the following year. He was sentenced to seventy years in prison. During their investigation, police officers allegedly withheld exculpatory evidence and coerced a jailhouse snitch to make fabricated statements implicating Virgil in the crime. He was incarcerated for twenty-eight years before DNA testing of the victim's rape kit excluded him as the perpetrator. He was released from prison in 2015 and the Campbell County Grand Jury declined to reindict.

In 2016, Virgil filed a lawsuit under 42 U.S.C. § 1983 against Newport alleging violations of his constitutional right to a fair trial, malicious prosecution, constitutional violations based on fabrication of false evidence, supervisory liability and negligent supervision, failure to intervene, conspiracy to deprive him of his constitutional rights, and intentional infliction of

2

emotional distress.[3] In his complaint, Virgil listed his damages as the pain and suffering he endured during incarceration, the disadvantages he faced in making a life for himself after incarceration, and damages "including but not limited to physical harm, mental suffering, and loss of a normal life" as a result of Newport's misconduct.

Newport tendered the lawsuit to the insurance companies that provided them with coverage from 1987 to 2015 for defense and indemnification. Westport insured Newport from July 1, 1997, to July 1, 2000, through three consecutive one-year policies. Each policy was modified by an endorsement for law enforcement liability ("LEL") coverage. Westport denied coverage because "no triggering event occurred during the Westport policy period." Ultimately, Westport chose to defend Newport in the lawsuit but reserved the right to seek a judicial determination of its coverage obligations.

In 2020, Westport initiated the underlying action to request the circuit court declare it had no duty to defend or indemnify Newport because Virgil's lawsuit did not allege that any bodily or personal injury occurred during its policy period. Westport named Virgil as a party to its action. The parties all moved for summary judgment.[4] After hearing oral arguments, the court

---

[3] In his complaint, Virgil also brought claims against the City of Cincinnati, Ohio, and the City of Norwood, Ohio, and police officers from those municipalities. Those claims are unrelated to this matter.

[4] Westport moved for a judgment on the pleadings. Kentucky Rules of Civil Procedure (CR) 12.03. The circuit court's consideration of documents outside the pleadings converted Westport's motion to one for summary judgment. CR 12.02.

granted Westport's motion, holding that no triggering event occurred during the policy period.

Newport and Virgil[5] appealed as a matter of right to the Court of Appeals. While the appeal was pending, Newport and Colemon settled the federal lawsuit. Under the terms of the settlement, Newport assigned all rights to any insurance proceeds and all causes of action against Westport to the estate. The Court of Appeals affirmed the circuit court judgment, holding Westport had no duty to defend or indemnify Newport because Virgil's alleged personal injury did not occur during the policy period. Colemon moved for discretionary review which we granted.

## ANALYSIS

On appeal, Colemon argues: (1) under a plain reading, Westport's LEL coverage is triggered by hurt or loss sustained during the policy period; (2) the Court of Appeals' reliance on the so-called "majority rule" is inconsistent with Kentucky jurisprudence and misplaced; and (3) the court's application of the majority rule is manifestly unjust because it modifies the terms of a valid contract and inures solely to the benefit of the insurer.

This case is solely about interpretation of the terms of an insurance contract. The law governing interpretation is well-settled. Our predecessor court clearly set out the role of the courts as follows:

---

[5] Virgil died prior to entry of the circuit court's judgment. Colemon, as administrator of his estate, was substituted as a party on April 20, 2022, after the notices of appeal were filed.

4

the terms of an insurance contract must control unless contravening public policy or a statute, and . . . the courts cannot make a new contract for the parties under the guise of interpretation or construction but must determine the rights of the parties according to the terms agreed upon by them.

*Cheek v. Commonwealth Life Ins. Co.*, 126 S.W.2d 1084, 1089 (Ky. 1939). "The only purpose of judicial construction is to remove ambiguity and doubt and to make certain that which in itself is uncertain." *Lynch v. Claims Mgmt. Corp.*, 306 S.W.3d 93, 98 (Ky. App. 2010) (quoting *Frear v. P.T.A. Indus., Inc.*, 103 S.W.3d 99, 106 (Ky. 2003). Because issues of interpretation and construction of contracts are questions of law, we review *de novo*, giving no deference to the circuit court's interpretation. *Morganfield Nat. Bank v. Damien Elder & Sons*, 836 S.W.2d 893, 895 (Ky. 1992); *Louisville Edible Oil Prods., Inc. v. Revenue Cabinet Commonwealth of Ky.*, 957 S.W.2d 272, 274 (Ky. App. 1997) (citations omitted).

"The terms of insurance coverage should not be extended beyond any clear or unambiguous limit." *Masler v. State Farm Mut. Auto. Ins. Co.*, 894 S.W.2d 633, 635-36 (Ky. 1995). A policy must be enforced as written, with unambiguous terms. *Lynch*, 306 S.W.3d at 97. Ambiguity arises only where a term is "susceptible to different or inconsistent interpretations []" by a reasonable person. *Jackson Hosp. Corp. v. United Clinics of Ky., LLC*, 545 S.W.3d 327, 332 (Ky. App. 2018). However, a party cannot "attempt to muddy the water and create some question of interpretation . . . [to] create an ambiguity" where none exists. *Sutton v. Shelter Mut. Ins. Co.*, 971 S.W.2d 807, 808 (Ky. App. 1997).

Therefore, the first step in our analysis is to determine if an ambiguity

exists in the Westport policy.

> [R]esolution of the ambiguity question will dictate how our interpretive analysis will proceed. If an ambiguity exists, the court will gather, if possible, the intention of the parties from the contract as a whole, and in doing so will consider the subject matter of the contract, the situation of the parties and the conditions under which the contract was written, by evaluating extrinsic evidence as to the parties' intentions. However, in the absence of ambiguity a written instrument will be enforced strictly according to its terms, and a court will interpret the contract's terms by assigning language its ordinary meaning and without resort to extrinsic evidence.

*Frear* 103 S.W.3d at 105-06 (internal quotation marks and footnotes omitted).

The LEL endorsement in Westport's 1997-1998 and 1998-1999 policies

read, in relevant part, as follows:

> **SECTION I – COVERAGES**
>
> **COVERAGE. A. BODILY INJURY, PROPERTY DAMAGE AND PERSONAL INJURY**
>
> **1. Insuring Agreement**
>
> We will pay those sums that the insured is legally obligated to pay as damages because of "bodily injury," "property damages," or "personal injury" to which this insurance applies. We will have the right and duty to defend any "suit" seeking those damages. We may at our discretion investigate any "occurrence" and settle any claim or "suit" that may result. But:
>
> . . .
>
> c. This insurance applies to "bodily injury," "personal injury," "property damage" and only if:
>
> . . .

(2) The "bodily injury," "property damage" or "personal injury" occurs during the policy period.

. . .

**SECTION V – DEFINITIONS**

. . .

6. "Damages" means monetary sums including compensatory and/or punitive when allowed by law. Any cost, fees or other expenses from injunctive or defamatory relief, however, are not included.

7. "Occurrence" means:

a. An accident, including continuous or repeated exposure to substantially the same general harmful conditions, that results in "bodily injury" or "property damage"; or

b. An offense that results in "personal injury."

8. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:

. . .

c. Malicious prosecution;

. . .

i. Violation of civil rights, including but not necessarily limited to violations of the Federal Civil Rights Act and similar laws.

Westport's 1999-2000 LEL coverage contains substantially the same terms but reads slightly differently. In our recitation of the relevant terms below, we will emphasize the terms that differ from those of the other policies.

2. **Insuring Agreement – LAW ENFORCEMENT LIABILITY**

   a. We will pay those sums that the insured becomes legally obligated to pay as "damages" because of "bodily injury," "property damage" or "personal injury" *caused by an "occurrence" or offense, as more fully described in the definitions of "personal injury," in the course of your "law enforcement activity"* to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking such "damages." *However, we will have no duty to defend the insured against any "suit" seeking "damages" because of "bodily injury," "property damage" or "personal injury" to which this insurance does not apply.* We may at our discretion investigate any "occurrence" or offense and settle any claim or "suit" that may result. But:

      . . .

   b. This insurance applies to "bodily injury," "property damage" or "personal injury" only if:

      . . .

         (2) The "bodily injury," "property damage" or "personal injury" occurs during the policy period.

. . .

**SECTION V – DEFINITIONS**

. . .

5. "Damages" means money damages, *including punitive damages where allowed by law, awarded to a person or entity as compensation for injury or loss caused by the tortious conduct of any insured.* "Damages" does not include: *(1) injunctive relief or costs to comply with injunctive relief; (2) restitution including refund of taxes; (3) fines, penalties, sanctions; (4) attorneys' fees, unless the attorneys' fees are awarded in addition to money damages*

> *otherwise covered by this policy; (5) nominal damages.*
>
> *. . .*
>
> 10. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.
>
> 11. "Personal injury" means injury, other than "bodily injury," arising out of one or more of the following offenses:
>
> *. . .*
>
> b. Malicious prosecution;
>
> *. . .*
>
> h. *Deprivation of rights, privileges, or immunities secured by the United States Constitution.*

Under the plain terms of the three policies, Westport's coverage is triggered by personal injuries that occur during the policy period, making them "occurrence-based policies." *Ky. State Univ. v. Darwin Nat'l Assurance Co.*, 677 S.W.3d 294, 305 (Ky. 2023) ("An occurrence-based policy . . . provides coverage for incidents which *occur* during the life of the policy without regard to when a claim is brought."). In this case, this means Virgil's personal injury must have occurred between July 1, 1997, and July 1, 2000, to trigger coverage under at least one of the policies. Under the 1997-1998 and 1998-1999 policies, "occurrence" is defined to include any "personal injury" arising out of an enumerated offense. The 1999-2000 policy's definitions differ in that "occurrence" is not defined to include "personal injury," but "personal injury" is still defined as arising out of a list of offenses. Relevant to Virgil's federal

9

lawsuit, under all three policies, the list of offenses includes "malicious prosecution" and deprivation and/or violation of civil and/or constitutional rights. Therefore, the Westport policies plainly limit coverage for personal injuries to those offenses that occur during the policy period. This leaves us only to answer whether Newport's alleged malicious prosecution "occurred" during the policy period.

Colemon asks this Court to follow the Sixth Circuit's decision *St. Paul Guardian Ins. Co. v. City of Newport, Ky.*, 804 F. App'x 379 (6th Cir. 2020), to hold that coverage under the three policies was triggered by Virgil's ongoing incarceration during the policy period. *St. Paul* also arose out of Virgil's federal lawsuit. St. Paul insured Newport from July 2007 to July 2010. *Id.* at 380. St. Paul's LEL policies each read, in relevant part,

> **Law enforcement liablity.** We'll pay amounts any protected person is legally required to pay as damages for covered injury or damage that:
>
> - results from law enforcement activities or operations by or for you;
>
> - happens while this agreement is in effect; and
>
> - is caused by a wrongful act that is committed while conducting law enforcement operations.

*Id.* at 381. After Newport demanded defense and indemnification, St. Paul filed suit in the Eastern District of Kentucky, asking the court to declare it had no duty to defend or indemnify Newport. *Id.* The district court found for St. Paul because Virgil's alleged personal injury did not occur during the coverage period. *Id.*

10

On appeal to the Sixth Circuit, the sole issue was whether any of Virgil's alleged injuries "happen[ed] while" the St. Paul policies were "in effect." *Id.* The parties made substantially the same arguments raised by the parties herein. Virgil argued his injuries were the time he lost from wrongful incarceration, loss of life experiences, and emotional pain and suffering. *Id.* at 382. St. Paul claims "Virgil suffered a malicious prosecution injury, which happened or was caused at the time of the wrongful institution of the legal process. In St. Paul's view, the unlawful detention that followed simply forms part of the damages for the malicious prosecution injury that happened earlier." *Id.* (internal quotation marks omitted).

The Sixth Circuit found St. Paul misread the plain terms of its policy. The court reasoned that the policy "covered personal injuries includ[ing] any injuries *caused by* the wrongful act –malicious prosecution. Malicious prosecution cannot, therefore, *be* the injury." *Id.* at 383. The St. Paul policy did not define "injury," leaving the Sixth Circuit to rely on the dictionary to define it as "a wrong inflicted or suffered," or a "[h]urt or loss caused to or sustained by a person." *Id.* (quoting Injury, Oxford English Dictionary (2d ed. 1989)). The court held "[t]here is no reason to read [the policy] language as excluding the possibility that the malicious prosecution caused harm or loss after the prosecution began but before exoneration." *Id.* at 384. The court further reasoned that St. Paul "kn[ew] how to bargain for the terms it now seeks[,]" because its later policies included deemer clauses which stated "some forms of property damage are considered 'to happen at the time of the wrongful act that

11

caused it.'" *Id.*[6] However, the court also acknowledged "[t]hat the parties wrote with more precision in later contracts is not necessarily conclusive of the earlier contracts' meaning." *Id.*

The Sixth Circuit held Virgil's wrongful imprisonment resulted in "physical and dignitary harms that accompany such confinement represent[ing] a continuous and ongoing injury." *Id.* (citation omitted). The court further held

> [t]hose injuries were caused by the malicious prosecution and were continuous, that is, they happened repeatedly, during the relevant coverage period. We conclude that these injuries are covered by the policy language as that language would be used and understood by the common person, . . . and at a minimum, we cannot say that these injuries are clearly *not* covered[.]"

*Id.* at 384-85 (internal citation omitted).

This matter is easily distinguishable from *St. Paul* based on the plain language of the Westport policies. First, none of Westport's policies contain deemer clauses like those in the St. Paul policies. For this reason, we decline to speculate about what Westport could have bargained for in a hypothetical scenario. Second, and most importantly, regardless of the Sixth Circuit's interpretation of the St. Paul policies, the Westport policies clearly state that malicious prosecution can, in fact, be the injury for insurance purposes. Under the Westport policies, coverage is triggered by a "personal injury" which

---

[6] St. Paul also insured Newport through three additional policies from July 2010 to July 2013.

"occurs" during the policy period. "Occurrence" is then defined as "an offense that results in 'personal injury.'" Malicious prosecution is then enumerated as one of the covered offenses.[7] This unambiguously means that the malicious prosecution is the personal injury. For these reasons, we are unconvinced by Colemon's argument for the applicability of *St. Paul.*

Instead, we find the Eighth Circuit's decision in *Genesis Ins. Co. v. City of Council Bluffs*, 677 F.3d 806 (8th Cir. 2012), to be helpful to our analysis. *Genesis* also arises out of a coverage dispute for a § 1983 action filed against a city and its police officers for malicious prosecution. *Id.* at 807. The Genesis policy provided coverage, in relevant part, for "personal injury . . . which occurs during this policy period and to which this insurance applies[.]" *Id.* at 809 (emphasis omitted). The policy defined "personal injury" as "injury, other than bodily injury, arising out of" a list of "offenses" which include "[m]alicious prosecution" and "violation of civil rights[.]" *Id.* at 809-10 (emphasis omitted). "[O]ccurrence" was defined "[w]ith respect to personal injury . . . [as] an offense or series of related offenses." *Id.* at 810. These terms are substantially similar to those of the Westport policies.

As is true in this case, when the Eighth Circuit decided *Genesis*, Iowa's appellate courts had not yet determined "when, for insurance coverage

---

[7] Although the definition for "occurrence" in the 1999 to 2000 Westport policy is not identical to the definition in the other two policies, the policy still requires the "personal injury," defined as a list of offenses, to occur during the policy period for coverage to be triggered. Malicious prosecution is a listed offense in all three Westport policies.

purposes, the tort of malicious prosecution occurs." *Id.* at 812. For this reason, the Eighth Circuit endeavored to decide how the Iowa Supreme Court might rule on this question. *Id.* Like the Court of Appeals in this matter, it found a "clear majority of courts have held the tort occurs when the underlying criminal charges are filed." *Id.* at 812-13.[8]

Colemon asserts that this rule has been "squarely rejected" by modern courts across the country. To support this argument, Coleman cites primarily to a handful of state and federal trial court decisions. We are unconvinced by this argument as the cited authority does not indicate a rejection of the rule stated in *Genesis* by courts across the country. We note, as Westport argues, the majority and minority positions are not regarding whether continued incarceration can trigger coverage, but rather whether coverage for malicious prosecution is triggered at the time charges are filed (the majority position) or at exoneration (the minority position). *St. Paul Fire & Marine Ins. Co. v. City of*

---

[8] Citing *City of Erie, Pa. v. Guar. Nat'l Ins. Co.,* 109 F.3d 156, 160 (3d Cir. 1997) (citing *Royal Indem. Co. v. Werner,* 979 F.2d 1299 (8th Cir.1992) (applying Missouri law); *S. Md. Agric. Ass'n, Inc. v. Bituminous Cas. Corp.,* 539 F.Supp. 1295 (D.Md.1982) (applying Maryland law); *Ethicon, Inc. v. Aetna Cas. & Sur. Co.,* 688 F.Supp. 119 (S.D.N.Y.1988) (applying New Jersey law); *S. Freedman & Sons, Inc. v. Hartford Fire Ins. Co.,* 396 A.2d 195 (D.C.1978); *Am. Family Mut. Ins. Co. v. McMullin,* 869 S.W.2d 862 (Mo.Ct.App.1994); *Paterson Tallow Co. v. Royal Globe Ins. Cos.,* 444 A.2d 579 (N. J. 1982); *Muller Fuel Oil Co. v. Ins. Co. of N. Am.,* 232 A.2d 168 (N. J. Super. Ct. App.Div.1967); *Harbor Ins. Co. v. Cent. Nat'l Ins. Co.,* 165 Cal.App.3d 1029, 211 Cal.Rptr. 902 (1985); *Zurich Ins. Co. v. Peterson,* 188 Cal.App.3d 438, 232 Cal.Rptr. 807 (1986); *Selective Ins. Co. of S. C. v. City of Paris,* 681 F.Supp.2d 975 (C.D.Ill.2010) (applying Illinois law); *N. River Ins. Co. v. Broward Cty. Sheriff's Office,* 428 F.Supp.2d 1284 (S.D.Fla.2006) (applying Florida law); *Coregis Ins. Co. v. City of Harrisburg,* No. 1:03–CV–920, 2006 WL 860710 (M.D.Pa. Mar. 30, 2006) (unpublished) (applying Pennsylvania law); *Billings v. Commerce Ins. Co.,* 936 N.E.2d 408 (Mass. 2010); *Town of Newfane v. Gen. Star Nat'l Ins. Co.,* 14 A.D.3d 72, (N.Y. App. Div. 2004); *Consulting Eng'rs, Inc. v. Ins. Co. of N. Am.,* 710 A.2d 82 (Pa.Super.Ct.1998).

*Zion*, 18 N.E.3d 193, 198 (Ill. 2014); *Billings*, 936 N.E.2d at 412-13 (finding only two jurisdictions wherein the malicious prosecution "occurs" for insurance purposes at exoneration).

Returning to *Genesis*, the Eighth Circuit further found, under Iowa law, for insurance purposes, a tort "occurs" when "the claimant *sustains damages*, not when the act or omission causing the damage takes place." 677 F.3d at 814. We agree with the Court of Appeals that, in Kentucky, "[f]or purposes of triggering insurance coverage . . . the time of the occurrence . . is when the complaining party was actually damaged or injured and not the time when the wrongful act was committed." *Davis v. Ky. Farm Bureau Mut. Ins. Co.*, 495 S.W.3d 159, 162 (Ky. App. 2016). For claims of malicious prosecution, "[t]he wrong and damage are practically contemporaneous." *Genesis*, 677 F.3d at 814. Therefore, we agree with the Eighth Circuit that, for insurance purposes, malicious prosecution occurs "at the time the underlying charges are filed." *Id.* at 814-15.

Therefore, as in *Genesis*, because the underlying charges were filed against Virgil in 1987, the personal injury occurred, for insurance purposes, more than a decade before the onset of Westport's coverage period. Because Virgil did not allege any specific, independent injury which occurred during Westport's coverage policy period and, instead, alleged only *damages* which arose out of Newport's malicious prosecution and continued throughout his entire incarceration, Westport's policies were not triggered.

15

Virgil's alleged damages also make this case distinguishable from those in which plaintiffs allege specific harms resulting from incarceration during the policy period. *Travelers Indem. Co. v. Mitchell*, 925 F.3d 236 (5th Cir. 2019). In *Mitchell*, Travelers insured Forrest County, Mississippi, under policies with terms identical to those of the *St. Paul* policies from 2005 to 2011. *Id.* at 240. Three men were wrongfully convicted of rape and murder in 1980. *Id.* at 239. In 2008, they were exonerated, and their estates later sued the county. *Id.*[9] They alleged several bodily injuries, including various infections and diseases resulting from the conditions of incarceration and mental anguish, embarrassment, humiliation, and emotional distress from denial of petitions for early release, which occurred during the policy period. *Id.* at 242.[10] The Fifth Circuit found Travelers had a duty to defend the county because these were distinct injuries that would not have occurred but for the county's wrongful acts. *Id.*

However, the Fifth Circuit expressly held the plaintiffs' "continued imprisonment, *alone*, did not trigger coverage []" because the triggering event, the filing of charges against them, for their personal injury claim, occurred decades before Travelers' coverage began. *Id.* at 241 (emphasis added). Unlike the plaintiffs in *Mitchell*, Virgil made no specific, independent allegations of bodily injuries that occurred during the Westport coverage period. Instead, he

---

[9] Two of the men, Ruffin and Dixon, died before they were exonerated. The third, Bivens, died three years after he was exonerated.

[10] The decision pertains only to Bivens and Dixon because Ruffin died before the Travelers policy period.

16

alleged continuous damages that all flowed from the malicious prosecution claim. Following the reasoning of both *Genesis* and *Mitchell*, such allegations do not trigger coverage under the plain language of Westport's policy.[11]

Finally, because insurance companies most often prepare insurance contracts, policies should be construed against the insurer if an ambiguity arises. *Cheek*, 126 S.W.2d at 1089. However, this rule "has no application to a term so clearly defined in the policy as to exclude coverage under the circumstances involved in the case." *Aetna Life & Cas. Co. v. Layne*, 554 S.W.2d 407, 409 (Ky. App. 1977). Colemon's claim that the Court of Appeals' decision somehow violates this principle by modifying the Westport policies for the company's benefit is incorrect. Contrary to Colemon's claims, the court did not "effectively draft[] a new insurance policy by adding both an exclusion and a condition which were not bargained for by the parties[.]" Rather, the court accurately construed the plain terms of the policies which unambiguously exclude coverage.

## CONCLUSION

Based on the foregoing, the opinion of the Court of Appeals is affirmed.

All sitting. All concur.

---

[11] The Sixth Circuit relied on the *Mitchell* decision in its analysis. *St. Paul*, 804 F. App'x. at 382. The court agreed with the Fifth Circuit's "reading of the policy and with the . . . assessment that under the policy's plain terms, [the insurer] must defend any claim in which covered injuries occurred while the agreements were in effect . . . regardless of when the wrongful causal act occurred." *Id.* (citation and internal quotation marks omitted). However, the Sixth Circuit failed to consider the difference between the plaintiffs' alleged personal injuries and bodily injuries. *Mitchell*, 925 F.3d at 241.

17

COUNSEL FOR APPELLANT:

Amy Robinson Staples
Elliot Slosar
Loevy & Loevy

Alexander T. Brown
Lathrop GPM LLP


COUNSEL FOR APPELLEE:

Adam H. Fleischer
Kevin F. Harris
BatesCarey LLP

William B. Orberson
Ryan D. Nafziger
Phillips Parker Orberson & Arnett, PLC


COUNSEL FOR AMICUS CURIAE,
KENTUCKY DEFENSE COUNSEL, INC.:

Edward M. O'Brien
Andrew Bokeno
Wilson Elser Moskowitz Edelman & Dicker, LLP


COUNSEL FOR AMICUS CURIAE,
KENTUCKY ASSOCIATION OF COUNTIES
ALL LINES FUND'S:

Jeffrey C. Mando
Jennifer L. Langen
Adams Law, PLLC

Timothy A. Sturgill
Kentucky Association of Counties


COUNSEL FOR AMICUS CURIAE,
THE CITY OF NEWPORT, KENTUCKY:

Jason C. Kuhlman
Law Office of Jason C. Kuhlman, PLLC

COUNSEL FOR AMICUS CURIAE,
LOUISVILLE/JEFFERSON COUNTY METRO
GOVERNMENT:

R. Allen Button
Keanna Cohen
Turner, Keal & Button, PLLC